**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2486-18T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

STEPHEN F. SCHARF,

    Defendant-Appellant.

_____

Submitted March 12, 2020 – Decided August 31, 2020

Before Judges Suter and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 09-08-1485.

Joseph E. Krakora, Public Defender, attorney for appellant (Steven M. Gilson, Designated Counsel, on the brief).

Mark Musella, Bergen County Prosecutor, attorney for respondent (Ian C. Kennedy, Assistant Prosecutor, of counsel; Catherine A. Foddai, Legal Assistant, on the brief).

PER CURIAM

Defendant Stephen F. Scharf appeals from the December 5, 2018 order of the Law Division denying his petition for post-conviction relief (PCR) without an evidentiary hearing. We affirm.

I.

The following facts are derived from the record. Because we write only for the parties, we provide an abbreviated rendition of the facts relevant to defendant's PCR claims.

On September 20, 1992, a man entered a police station to report that someone, later identified as defendant, had flagged him down at a highway rest stop seeking help because his wife had fallen off a cliff. The police did not record the man's name or contact information.

Officers who responded to the scene met with defendant who said he and his wife, Jody Ann Scharf, stopped at the park on their way to a date and were sitting on a ledge at the top of a cliff. Defendant told the officers that when he got up to get a blanket and wine from his car, his wife stood up, asked him not to go, and fell off the cliff.

Rescue personnel rappelled down the cliff to look for Jody.[1] The officers found her purse and some of its contents scattered on an outcropping about eight

---

[1] Because defendant and Jody shared a surname, we use her first name.

feet below the ledge. They did not photograph the evidence or document its location. The officers placed the contents back into the handbag, which they tossed up to another officer. As they progressed downward, the officers found no indication someone had fallen down the face of the cliff, including a lack of debris, clothing, blood, hair, tissue, or broken branches.

The officers located Jody's body face-down between a tree and a rock approximately 119 feet vertically and fifty-two and half feet horizontally from the ledge. Jody showed no signs of life and had substantial physical injuries, including severe trauma to her skull and chest. The officers identified an apparent impact point on an overhanging tree, which was covered in blood and tissue, eight feet above the body.

The officers did not photograph Jody's body or otherwise document its location. Nor did they collect blood or tissue samples from the apparent point of contact in the tree. The officers moved the rock next to the body without first photographing the rock or documenting its location. The officers gave conflicting accounts of whether there had been blood on the rock. Photographs of the tree taken later do not show the rock. The officers put the body in a basket and lowered it to a road at the cliff base. The clothing on Jody's body was destroyed after being turned over to a funeral home director.

A-2486-18T1

The medical examiner, who did not go to the scene, pronounced Jody dead over the telephone. After an autopsy, she determined the cause of death as "multiple fractures and injuries" but listed the manner of death as "pending investigation." In 1993, the medical examiner changed the manner of death to "could not be determined."

On the night of the incident, defendant consented to a search of his car, which revealed, along with a number of other items, a claw hammer. In an interview at the police station, defendant said the hammer was in the car because he had been using it to fix a drawer in the kitchen of the couple's home, placed it in a bag intending to drop it off in the garage as he left for the park with Jody, but forgot to do so. Police did not record defendant's interview.

When police later searched defendant's home, they did not photograph or seize the kitchen drawer. An officer testified that during the search of defendant's home, defendant spontaneously turned to the officer and asked: "[Y]ou don't believe this was an accident[?]" or "[Y]ou don't believe me[?]" The officer said he believed an accident had occurred, to which defendant "said, [']no,['] and put his head down" and, shortly after, asked to speak with a priest. The officer recounted the conversation with a detective, but did not write a report detailing the exchange. Another officer recalled writing a report about

the conversation but was unable to locate it. Defendant initially was not charged in connection with Jody's death.

In 2004, the prosecutor's office began a "comprehensive review" of the matter. In 2006, the medical examiner visited the location at which Jody's body was found. Having viewed the scene, and with greater experience examining fall victims, she determined Jody's injuries were inconsistent with a passive fall down the cliff face and were indicative of her having been propelled off the cliff. In 2007, she amended the death certificate to state homicide as the manner of death. She did not take measurements at the scene or samples of tree bark to compare to Jody's injuries.

The investigation also revealed the couple's marriage was unhappy, with both defendant and his wife openly having affairs. Defendant told inconsistent stories to the women he was dating. He told one woman that his wife had died in an automobile accident in 1979, and his son was from a different relationship. To another woman, defendant said he and Jody were in the process of divorcing. Shortly before Jody's death, he told a woman he was dating that he was fighting with his son's mother over custody but that most of the stress he was under would be gone in September.

5

In addition, the investigation revealed defendant obtained an insurance policy on Jody's life with an accidental disability benefit. He collected more than $700,000 from the policy.

Investigators documented numerous statements by Jody to her friends and therapist expressing fear of defendant. She told one friend she was concerned defendant would harm her if she served him with a divorce complaint and to suspect defendant if she died under unusual circumstances. Jody told her defendant "really . . . wants me gone . . . . " She told her therapist that she suffered mental and physical abuse from defendant, who she described as very punitive. The therapist reported that about a month before her death Jody recounted that defendant said that he had been to a park on the Palisades with a beautiful view and that he wanted to take Jody there. Jody told defendant he "was crazy" and would not go to a cliff.

Two weeks before Jody died, her attorney served defendant with a divorce complaint, alleging he was unfaithful and abusive. Jody told a friend defendant was unhappy she was seeking a divorce, that she was afraid of him, and wanted him out of the house. The day before her death, Jody told a friend that defendant "threatened her life" and would rather "see her dead before . . . he would sign"

A-2486-18T1

the divorce papers.  She told another friend she was "afraid [defendant] was going to kill her because of the divorce."

The couple's son told investigators Jody had expressed fear of defendant and refused to be alone with him.  He also stated Jody was extremely fearful of heights and doubted she would sit on a ledge on a cliff.  In addition, he told police Jody had told him defendant was "hitting her, abusing her and seeing other people . . . [a]nd she could[ not] take it anymore," which was the reason she filed for divorce.

On August 13, 2009, defendant was indicted by a grand jury for the knowing and purposeful murder of Jody, N.J.S.A. 2C:11-3(a)(1) and (2).  At trial, two experts and the medical examiner offered their opinions that Jody could not have fallen as she did without having been pushed off the cliff.  Defendant presented expert testimony that Jody fell accidentally, striking the outcropping where her purse and its contents were found, which propelled her further out horizontally and caused her to have four or five impacts before striking the tree.

A jury found defendant guilty of murder, contrary to N.J.S.A. 2C:11-3(a)(1) and (2).  The trial court sentenced defendant to life imprisonment with a thirty-year period of parole ineligibility.

On direct appeal, we reversed defendant's conviction, holding the trial court erred by admitting Jody's out-of-court statements to her friends and therapist. State v. Scharf, No. A-1580-11 (App. Div. Aug. 11, 2014). The Supreme Court reversed, reinstating defendant's conviction and remanding to us to consider defendant's argument that the trial court erred by not charging the jury on manslaughter. State v. Scharf, 225 N.J. 547 (2016).

While the remand was pending, defendant filed a petition for PCR. The trial court dismissed the petition without prejudice to be refiled within ninety days of the outcome of the remand proceedings.

On January 27, 2017, we rejected defendant's jury instruction argument and affirmed his conviction. State v. Scharf, No. A-1580-11 (App. Div. Jan. 27, 2017). The Supreme Court denied certification. State v. Scharf, No. 078952 (Mar. 21, 2017).

On May 26, 2017, defendant refiled his petition for PCR. He alleged he was deprived the opportunity to raise an effective defense and to cross-examine witnesses because the State failed to collect and preserve evidence. He also alleged ineffective assistance of trial counsel because his attorney: (1) did not call him as a witness at a hearing on his motion to suppress his statements to police; (2) advised him not to testify at trial to prevent cross-examination about

his extramarital affairs, even though evidence of those affairs was admitted through other witnesses; (3) failed adequately to argue defendant was harmed by the State's spoliation of evidence; and (4) did not request an adverse inference jury charge based on spoliation. Finally, defendant argued his appellate counsel was ineffective for not raising arguments based on spoliation.[2]

On December 5, 2018, Judge James X. Sattely issued a comprehensive and well-reasoned written opinion denying defendant's PCR petition without an evidentiary hearing. The judge found defendant's allegations regarding the spoliation of evidence and the absence of an adverse inference jury instruction to be barred by Rule 3:22-4 because those claims could have been, but were not, raised in defendant's direct appeal. With respect to the cross-examination of witnesses, the trial court found that defendant "does not cite to any of the State's witnesses that he was not permitted to cross-examine or a denial of any opportunity to confront his accusers."

---

[2] Defendant also alleged trial counsel was ineffective because he failed to object to the admission of excessive autopsy photographs. Because he does not raise the issue in his brief, we deem it to be waived. "[A]n issue not briefed is deemed waived." Pressler & Verniero, Current N.J. Court Rules, cmt. 5 on R. 2:6-2 (2020); Telebright Corp. v. Dir., N.J. Div. of Taxation, 424 N.J. Super. 384, 393 (App. Div. 2012) (deeming a contention waived when the party failed to include any arguments supporting the contention in its brief).

With regard to the deprivation of the defendant's right to testify at trial, the court held that:

> [t]rial counsel stated on the record that counsel and the defendant spoke extensively about the defendant's right to testify. [The trial court] then followed up with the defendant to ensure the defendant understood it was his decision as to whether or not the defendant wanted to testify. The defendant affirmed he had decided not to testify and that the defendant wanted [the court] to read the [e]lection [n]ot [t]o [t]estify charge to the jury. The defendant was presented with two opportunities on the record to testify on his own behalf and both times chose not to. The defendant did not object or oppose . . . the statements made by his counsel stating they had discussed the option of testifying.
>
> . . . .
>
> Even if this was a strategic decision by counsel and not the defendant's personal choice, the defendant's argument does not reach a level in which trial counsel was acting below a standard of an objective reasonable representation. Defendant has not shown that trial counsel's performance was defective. Therefore, the defendant fails to prove the first prong of [his ineffective assistance of counsel claim.]

Addressing defendant's argument with respect to not testifying at the suppression hearing, Judge Sattely held that trial counsel raised numerous points at the suppression hearing with respect to the voluntariness of defendant's statements to police that defendant argues would have been addressed in his

10

testimony. The judge found defendant did not make a prima facie showing trial counsel's performance at the hearing was ineffective.

The trial court also concluded defendant did not establish a prima facie claim of ineffective assistance of appellate counsel. Judge Sattely explained:

> Appellate counsel is not required to raise every possible claim. The defendant's appellate counsel was initially very successful on direct appeal, leading to defendant's conviction being reversed until reaching the New Jersey Supreme Court. . . . Notwithstanding the procedural bars, the arguments fail . . . . Counsel's choice not to pursue those issues do not rise to defective representation, but a choice in their litigation strategy. The defendant was not prejudiced by counsel choosing not to raise those . . . issues. Further, appellate counsel was not ineffective in the defendant's representation on direct appeal.

In light of its conclusion that defendant did not make a prima facie case of ineffective assistance of counsel, the trial court determined an evidentiary hearing was not required.

This appeal followed. Defendant raises the following arguments.

> POINT I
>
> THE PCR COURT ERRED BY PROCEDURALLY BARRING DEFENDANT'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS REGARDING THE STATE'S SPOLIATION OF EVIDENCE; THEREFORE, THIS MATTER MUST BE REMANDED FOR THE COURT TO ADDRESS THESE CLAIMS SUBSTANTIVELY.

POINT II

THIS MATTER MUST BE REMANDED FOR AN EVIDENTIARY HEARING BECAUSE DEFENDANT ESTABLISHED A <u>PRIMA FACIE</u> CASE OF TRIAL COUNSEL['S] INEFFECTIVENESS FOR ABRIDGING HIS CONSTITUTIONAL RIGHT TO TESTIFY.

II.

The trial court relied on <u>Rule</u> 3:22-4 for its conclusion that several of defendant's PCR claims were barred. The rule provides, in relevant part:

> (a) First Petition for Post-Conviction Relief. Any ground for relief not raised in the proceeding resulting in the conviction . . . or in any appeal taken in any such proceedings is barred from assertion in a proceeding under this rule unless the court on motion or at a hearing finds:
>
> (1) that the ground for relief not previously asserted could not reasonably have been raised in any prior proceeding; or
>
> (2) that enforcement of the bar to preclude claims, including one for ineffective assistance of counsel, would result in fundamental injustice . . . .
>
> . . . .
>
> A ground could not reasonably have been raised in a prior proceedings only if defendant shows that the factual predicate for that ground could not have been discovered earlier through the exercise of reasonable diligence.

[<u>R.</u> 3:22-4.]

To the extent that defendant raised the spoliation of evidence and lack of an adverse inference instruction as independent substantive claims in his PCR petition, we agree with the trial court that those claims are barred by <u>Rule</u> 3:22-4(a). Each of those arguments could have been, but were not, raised by defendant in his direct appeal.

To the extent defendant characterizes those claims as ineffective assistance of trial counsel, a different analysis obtains. "Post-conviction relief is New Jersey's analogue to the federal writ of habeas corpus." <u>State v. Preciose</u>, 129 N.J. 451, 459 (1992). Under <u>Rule</u> 3:22-2(a), a defendant is entitled to post-conviction relief if there was a "[s]ubstantial denial in the conviction proceedings of defendant's rights under the Constitution of the United States or the Constitution or laws of the State of New Jersey . . . ." "A petitioner must establish the right to such relief by a preponderance of the credible evidence." <u>Preciose</u>, 129 N.J. at 459. "To sustain that burden, specific facts" that "provide the court with an adequate basis on which to rest its decision" must be articulated. <u>State v. Mitchell</u>, 126 N.J. 565, 579 (1992).

The Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution guarantee criminal defendants the

right to the effective assistance of counsel. State v. O'Neil, 219 N.J. 598, 610 (2014) (citing Strickland v. Washington, 466 U.S. 668, 686 (1984); State v. Fritz, 105 N.J. 42, 58 (1987)). To succeed on a claim of ineffective assistance of counsel, the defendant must meet the two-part test established by Strickland, and adopted by our Supreme Court in Fritz. 466 U.S. at 687; 105 N.J. at 58.

Under Strickland, a defendant first must show that his or her attorney made errors "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." 466 U.S. at 687. Counsel's performance is deficient if it "[falls] below an objective standard of reasonableness." Id. at 688.

A defendant also must show that counsel's "deficient performance prejudiced the defense." Id. at 687. A defendant must establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the trial. Ibid. "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." Id. at 697; State v. Marshall, 148 N.J. 89, 261 (1997). "If it is easier to dispose of an ineffectiveness claim on the ground

of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697.

A hearing on a PCR petition is required only when: (1) a defendant establishes a prima facie case in support of PCR; (2) the court determines that there are disputed issues of material fact that cannot be resolved by review of the existing record; and (3) the court determines that an evidentiary hearing is required to resolve the claims asserted. State v. Porter, 216 N.J. 343, 354 (2013) (citing R. 3:22-10(b)). "A prima facie case is established when a defendant demonstrates 'a reasonable likelihood that his or her claim, viewing the facts alleged in the light most favorable to the defendant, will ultimately succeed on the merits.'" Id. at 355 (quoting R. 3:22-10(b)).

The record supports the trial court's conclusion that defendant did not establish a prima facie case of ineffective assistance of trial counsel. Trial counsel raised the issue of spoliation in his opening statement and summation. The jury, therefore, was apprised of defendant's claims that the State failed to collect and maintain evidence that may have proven helpful to defendant.

In addition, trial counsel's failure to request an adverse inference charge based on spoliation did not harm defendant. When determining whether the spoliation of evidence resulted in denial of a criminal defendant's due process

rights, the court must consider: (1) whether there was bad faith or connivance on the part of the government; (2) whether the evidence was sufficiently material to the defense; and (3) whether defendant was prejudiced by the loss or destruction of evidence. State v. Hollander, 201 N.J. Super. 453, 479 (App. Div. 1985); see also United States v. Wise, 221 F.3d 140, 156 (5th Cir. 2000) (holding that adverse inference charge requires finding of bad faith conduct by the government).

Evidence is material if it possessed an exculpatory value that was apparent before it was destroyed. California v. Trombetta, 467 U.S. 479, 489 (1984). The evidence must be expected to play a significant role in the defense and be of such a nature that the defendant would be unable to obtain comparable evidence by any other reasonably available means. Arizona v. Youngblood, 488 U.S. 51, 58 (1988); Trombetta, 467 U.S. at 489; State v. Marshall, 123 N.J. 1, 109 (1991).

The record contains no evidence of bad faith on the part of police or the prosecutor. Nor has defendant demonstrated that the evidence he alleges to have been destroyed would have been exculpatory. There was, therefore, no justification for an adverse inference charge to the jury. See State v. Zenquis, 251 N.J. Super. 358, 370 (App. Div. 1991), aff'd, 131 N.J. 84 (1993).

A-2486-18T1

Furthermore, failure to give a charge must be evaluated in light of the totality of the circumstances, including all the instructions and the arguments of counsel. State v. Camaco, 218 N.J. 533, 551 (2014); State v. Timmendequas, 161 N.J. 515, 633-34 (1999). Given defense counsel's statements to the jury challenging the motive of the police and prosecutors, and attacking the quality of their investigation, the jury likely considered defendant's claim of spoliation during its deliberations.

We reach the same conclusion with respect defendant's claim of ineffective assistance of appellate counsel. Defendant must demonstrate that appellate counsel's representation fell below an objective standard of reasonableness and that, but for unprofessional errors, the result on appeal would have been different. State v. Gaither, 396 N.J. Super. 508, 513-14 (App. Div. 2007). The court must take into account that matters of appellate strategy lie within the discretion of appellate counsel, who is not required to raise every colorable claim on appeal. Jones v. Barnes, 463 U.S. 745, 754 (1983); Gaither, 396 N.J. Super. at 515-16. Failing to raise an argument on appeal which would not have been successful cannot constitute ineffective assistance of appellate counsel. State v. Warlock, 117 N.J. 596, 625 (1990).

A-2486-18T1

As noted by the trial court, defendant's appellate counsel made the strategic decision to focus on arguments determined to have the greatest potential to succeed. The fact that appellate counsel achieved a reversal of defendant's convictions before this court is evidence of effectiveness, even if the Supreme Court later reversed our decision. Defendant did not make a prima facie showing that appellate counsel was ineffective for not advancing arguments based on spoliation, which we noted above would have limited application here, on appeal.

The record also supports the trial court's conclusion that defendant did not make a prima facie showing of ineffective assistance of trial counsel relating to him not testifying at trial or the suppression hearing. The record contains ample evidence establishing that defendant elected not to testify at trial. The trial court engaged in an extensive discussion on the record with defendant and his counsel with respect to defendant's election.

In the middle of trial, the court explored with defendant the fact that the decision of whether or not to testify belonged to him. The court urged defendant to discuss the decision with his counsel, who the court characterized as "very competent." At the close of defendant's case, the court again addressed the issue with defendant, who stated unequivocally that he understood that he had an

18

absolute right to testify and that, after consultation with counsel, he had elected not to. The record demonstrates that defendant decided not to testify after being advised by counsel of the hazards of cross-examination. Trial counsel's representation on this point was not deficient.

Finally, we agree with Judge Sattely's conclusion that defendant did not make a prima facie showing that his testimony at the suppression hearing would have changed the outcome. Defendant argues that had he been properly advised by counsel he would have testified that he did not feel free to leave when he made statements to police. However, the motion judge made extensive findings with respect to the objective circumstances surrounding defendant's voluntary statements. See State v. O'Neal, 190 N.J. 601, 616 (2007). The motion judge found all of defendant's statements were admissible because they were in response to on-scene questioning, voluntarily made while defendant was not in custody, or after defendant voluntarily offered to take a polygraph examination. Testimony regarding defendant's subjective belief he was not free to leave would not have changed the outcome of the suppression hearing. See State v. Bey, 161 N.J. 233, 271-72 (1999) (holding that to meet the two-prong Strickland test defendant would have to show that had he testified, the result of the hearing would have been different).

19                                                    A-2486-18T1

To the extent we have not specifically addressed any of defendant's remaining contentions, we conclude they lack sufficient merit to warrant discussion in a written opinion.  <u>R.</u> 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2486-18T1